177 P.3d 312

**Maricopa County Sheriff Joseph ARPAIO, Petitioner,**

**v.**

**The Honorable Anna M. BACA, Judge of the Superior Court of the State of Arizona, in and for the County of Maricopa, Respondent Judge,**

Ozie Washington, Dionicio Luquendo Vargas, Jose Martinez Cisneros, Robert Hernandez, Irma Garcia, in-custody Clients of the Maricopa County Public Defender's Office, Real Parties in Interest.

No. 1 CA–SA 07–0267.

Court of Appeals of Arizona, Division 1, Department A.

Feb. 26, 2008.

Review Denied June 3, 2008.

Iafrate & Associates By Michele M. Iafrate, Phoenix, Attorneys for Petitioner.

Law Office of the Public Defender By James P. Leonard, David J. Kephart, Phoenix, Attorneys for Real Parties in Interest.

## OPINION

HALL, Judge.

¶ 1 During the first week of November 2007, the Maricopa County Office of Management and Budget informed Maricopa County Sheriff Joseph Arpaio (the Sheriff) that the Maricopa County Sheriff's Office (MCSO) had exceeded its overtime budget for the fiscal year and that no contingency funds would be made available to cover overages as had been done in prior years. Accordingly, the Sheriff reallocated personnel within the

MCSO to ensure that five of its jail facilities [1] would be adequately staffed without the need to have detention officers work overtime. As part of this reallocation, the MCSO announced plans to reduce privileged visitation hours [2] at the jail facilities, which it did effective November 14, 2007.

¶ 2 The Maricopa County Public Defender's Office moved to reinstate the previous privileged visitation schedule. After an extensive evidentiary hearing, the Honorable Anna M. Baca, the presiding criminal judge for the Maricopa County Superior Court, concluded that the new schedule for privileged visits violated in-custody defendants' constitutional rights to counsel and access to the courts and entered an interim order extending the hours of privileged visitation at all jail facilities. The superior court further ordered the parties to mediate a privileged visitation schedule that would not impinge on defendants' constitutional rights to counsel and access. The Sheriff seeks special action relief from the superior court's orders.

¶ 3 We previously issued an order accepting special action jurisdiction with a written decision to follow. We accepted jurisdiction because the questions presented raise issues of substantial public interest and importance regarding the doctrine of inherent powers and corresponding limitations on a court's authority to grant broad injunctive relief in criminal cases. Moreover, an appeal would not constitute an "equally plain, speedy and adequate remedy." Ariz. R.P. Spec. Act. 1.

¶ 4 We decide that the superior court was empowered to conduct a joint hearing regarding the common issue in the criminal cases: whether the Sheriff's revised privileged visitation schedule unreasonably burdened or substantially interfered with the Sixth Amendment rights of *individual* defendants. We conclude, however, that the court lacked authority in this criminal proceeding to grant injunctive relief applicable to *all* incarcerated defendants. We further conclude that any remedial relief must be narrowly tailored in a manner designed to remedy any constitutional violations without unnecessarily intruding on the Sheriff's authority to establish visitation hours. *See* Ariz.Rev.Stat. (A.R.S.) § 11–441(A)(5) (Supp. 2007) (requiring the sheriff to "[t]ake charge of and keep the county jail ... and the prisoners in the county jail"). Finally, we determine that the superior court exceeded its authority by requiring the parties to submit to mediation. Therefore, we grant the Sheriff's request for relief in part and deny it in part.[3]

### FACTUAL AND PROCEDURAL BACKGROUND

¶ 5 As of November 2007, the MCSO had approximately 150 detention officer vacancies. Until that time, the Sheriff provided adequate staffing at the jail, despite the shortage, through overtime scheduling. However, after being advised that the MCSO had exceeded its overtime budget, the Sheriff instituted several changes to curtail overtime

---

1. The five affected jail facilities are Durango, Estrella, Lower Buckeye, Towers, and 4th Avenue.

2. Privileged visits include those by attorneys, legal staff, and probation officers, as well as those persons necessary for the exercise of those individuals' responsibilities, e.g., interpreters and mental health evaluators.

3. In accepting jurisdiction and granting relief, we reject the defendants' suggestion that we decline jurisdiction pursuant to Article 6, Section 5(1) of the Arizona Constitution, which grants the Arizona Supreme Court "[o]riginal jurisdiction of habeas corpus, and quo warranto, mandamus, injunction and other extraordinary writs to State officers." The defendants did not institute this challenge via an extraordinary writ issued to a State officer and the Sheriff did not object in the superior court regarding the propriety of his

action being challenged in an on-going criminal case to which he was not initially a party. More importantly, the superior court's order was intended as an exercise of its inherent authority to take actions necessary to effectuate the administration of justice in cases pending before it. *See Holaway v. Realty Assocs.*, 90 Ariz. 289, 293, 367 P.2d 643, 646 (1961) (stating rule that the grant of jurisdiction implies "necessary and usual incidental powers essential to effectuate it"); *see generally* 20 Am Jur.2d *Courts* § 85 ("Although the primary jurisdiction of a court is its power to hear and adjudicate the cases brought before it, it also has ancillary jurisdiction to take actions that are incidental to the exercise of its primary jurisdiction."). In any event, the grant of original jurisdiction to the supreme court in § 5(1) is not a grant of *exclusive* original jurisdiction.

scheduling. These changes included the closures of two outlying jail facilities and a "booking van" that transported city arrestees to county jail facilities, as well as the transfer of dozens of detention officers from the hiring, intelligence, and visitation departments to the housing units at the jails to ensure that a sufficient number of officers was available to monitor and secure the inmates.[4]

¶ 6 To compensate for the reduced workforce in the visitation department, the MCSO implemented a revised privileged visitation schedule. Pursuant to the revised schedule, privileged visits were permitted each day only from 6:30 a.m. to 2:30 p.m., with possible accommodation for special circumstances when "manpower" allowed it.

¶ 7 On November 13, 2007, two attorneys employed by the Office of the Public Defender, James P. Leonard and David J. Kephart, filed a "Request for Restoration of Privileged Visitation Schedule or in the Alternative Request for Emergency Injunctive Relief" in the case of *State v. Ozie Washington*, cause no. CR 2007–156830. In the motion, the attorneys argued that the new inmate privileged visitation schedule "directly violates in-custody defendants' rights" under both the United States and Arizona Constitutions. As support for their argument, the attorneys claimed that "the new privileged visitation schedule does not allow enough time to effectively communicate with in-custody defendants, especially when these communications involve the investigation of cases, the negotiation and explanation of plea agreements, the preparation of evidentiary hearings and trials, and the preparation of sentencing and mitigation hearings."

¶ 8 On November 14, 2007, Judge Baca entered an order denying the motion. Judge Baca explained her ruling by noting that the defense attorneys essentially sought a declaratory judgment or injunctive relief in a criminal case, and also finding that the request was based on speculative future harm and therefore "fail[ed] to state a claim related to this defendant."

¶ 9 The following day, Leonard and Kephart filed a motion for reconsideration or, in the alternative, a request for emergency injunctive relief. This motion was filed in *Washington* and six other criminal cases. The attorneys asserted that, during the two days in which the new privileged visitation policy had been in effect, numerous defendants' right to counsel had "been directly violated." In addition to claiming the infringement on communication between attorneys and clients, the attorneys also argued that the new privileged visitation schedule "adversely impacts other parties, such as court interpreters." As support for their claims, the attorneys attached their affidavits, as well as affidavits of other attorneys employed by the Office of the Public Defender, avowing that they were unable to meet with their clients because of the new visitation schedule at times they would have been able to meet under the previous schedule.

¶ 10 Judge Baca set a status conference regarding the motion for November 16, 2007. At that hearing, Judge Baca ordered the MCSO to respond to the defendants' motion by November 19 and set an evidentiary hearing to begin November 20, 2007.

¶ 11 The evidentiary hearing was conducted over eight days. Judge Baca heard testimony from numerous witnesses, including MCSO employees, probation officers, defense attorneys, court interpreters, and mental health personnel.[5]

¶ 12 After taking the matter under advisement, Judge Baca entered a detailed ruling (1) finding that the new schedule for privileged visits at the MCSO facilities violates all in-custody defendants' constitutional right to counsel and access to the courts; (2) entering temporary orders requiring the MCSO to

---

**4.** Deputy Chief Michael Olson testified that 105 detention officers had been transferred to the housing units as of November 29, 2007.

**5.** We limit our analysis to the core issue considered by Judge Baca: whether the revised privileged visitation schedule violated the defendants' Sixth Amendment right to the assistance of counsel by depriving them of a reasonable opportunity to confer with their attorneys. Accordingly, we do not consider whether any delay in court proceedings or inconvenience to court officers, victims, or the public attributable to the new visitation hours would separately justify intervention by the court.

extend the hours of privileged visitation at the facilities;[6] and (3) ordering the parties to participate in mediation. In relevant part, the superior court found:

1. Effective November 12, 2007, the MCSO changed its privileged visitation hours to 6:30 a.m. to 2:30 p.m. . . . Previous visiting hours for in-person visits by attorneys had been unrestricted but, as a practical matter, generally did not extend beyond 9:00 p.m. weekdays.

2. After this change in hours, a number of instances occurred in which defense attorneys attempted to visit their in-custody clients after 2:30 and were turned away at various jail locations. In other instances privileged visits were cut short around 2:30 p.m. before the visit could be completed. In other cases requests for video conferences were affected because of the reduced number of time slots available for defense counsel and APD [Arizona Probation Department] officers.

3. Defense attorneys are generally in court each morning for morning calendars until about 10:30 or 11:00. . . . Thus, defense attorneys are usually unable to conduct in-person jail visitation during the morning hours. Attorneys who are in trial all day are unable to confer with their clients after trial each day under the new visitation hours.

4. All three indigent defense agencies share videoconferencing (remote access) time, along with the APD officers. The remote accessing hours were reduced to both defense counsel and APD officers with the November 12, 2007 changes. . . .

5. Videoconferencing is impractical for non-English speaking defendants. Furthermore, remote videoconferencing cannot be used to review a plea agreement with a defendant. . . . Therefore, remote videoconferencing is not a substitute for in-person visitation.

6. Defense attorneys utilize [Court Interpreters Translation Service] interpreters when conferring with non-English speaking defendants at the jails. . . .

. . . .

9. The MCSO reduced the visitation hours for budgetary reasons. . . .

10. After November 12, 2007, the MCSO has occasionally made "special accommodations" for after-hours visits (after 2:30 p.m.) under special circumstances and if there was sufficient staff. However, there is no MCSO policy or directive regarding special accommodations. Whether to grant a special accommodation for an after-hours visit is discretionary. . . .

11. The reduced visitation hours have impinged and obstructed the right to counsel and access to the courts. . . .

Based on these findings, the superior court further found:

[T]he new schedule for privileged visits at the MCSO facilities impairs the in-custody defendants' constitutional right to counsel. The new schedule was not implemented because of any MCSO need to safeguard jail security, but because of its budget problems, resulting in eliminating detention officer assignments on shift 2 privileged visits. . . . The MCSO changes in privileged visit hours, taken to resolve its budget issues, are not an allowable basis for the result which impairs in-custody defendants' constitutional right to counsel and access to the courts.

¶ 13 The superior court then entered several "temporary orders" to remedy the deficiency, including directing the MCSO to allow privileged visits at all five jail facilities until 9:00 p.m. daily. The superior court further required the parties to mediate a "reasonable privileged visitation schedule that will not impinge on in-custody defendants' constitutional right to counsel and access to the courts, and will also give due consideration to the MCSO's budget concerns." The ordered visitation schedule would last until "the parties agree to a sched-

6. The Sheriff argues that the court order "expanded privileged visitation beyond the hours that existed at several facilities prior to the schedule change." The defendants did not respond to this claim and the nature of the previ- ous schedule is not clear from the record. However, any dispute the parties may have as to whether the court expanded or merely reinstated the previous privileged visitation schedule is not material to our analysis.

ule for privilege visitation" or until the superior court entered further orders.

## DISCUSSION

### I.  The Consolidated Hearing

¶ 14 The Sheriff contends that Judge Baca did not have "jurisdiction" over these cases.  Specifically, the Sheriff claims that "[a] judge not assigned to the criminal cases, despite being the presiding criminal judge, cannot grant itself [sic] jurisdiction to entertain multiple motions/affidavits from defense counsel in criminal matters over which she does not preside and hold an evidentiary hearing affecting those cases assigned to other criminal judges."  In response, the defendants first claim that the Sheriff waived this argument by not objecting when Judge Baca informed the parties that she would hear and resolve the privileged visitation issue in all cases in which such motions had been filed. Second, they argue that Judge Baca, as the presiding criminal judge, could properly assign this issue to herself pursuant to Arizona Rules of the Supreme Court (Rule) 92, which authorizes a presiding judge to "[m]ake regular and special assignments of all judges." *See also* Ariz. S.Ct. Admin. Order No. 2005–32 (detailing the duties of presiding judges).

¶ 15 We begin our analysis by noting that Judge Baca never formally consolidated these cases nor transferred them to her court.  Instead, the record reflects that the public defender provided filed copies of its original motion in the *Washington* case requesting restoration of the privileged visitation schedule or for emergency injunctive relief on behalf of both Washington and the "In–Custody Clients of the Maricopa County Public Defender's Office" to both the assigned trial judge and to Judge Baca in her capacity as the presiding criminal judge. The next day, Judge Baca summarily denied the motion.  The public defenders subsequently filed a motion for reconsideration in which they also added cases involving four additional defendants and again provided copies to each of the assigned trial judges and Judge Baca. Judge Baca held a scheduling conference the following day, at which time she noted that all the motions "raised basically the same issues" regarding privi-

leged visitation and other access issues.  She informed counsel that:

> I've already notified our judges that if they get any more written motions related to the access to Defendants that are incarcerated, that they are to refer those to me. So anything that comes over that raises those issues will be added to the motion that I already have in front of me so that we can get it resolved.

¶ 16 When Judge Baca then asked "[h]ow do we combine all of the issues so that I can efficiently hear all the evidence," the Sheriff's attorney responded that she "envision[ed] that we could do a generalized motion that would probably relate to many of the individual motions...."  Given the clear indication from Judge Baca that she intended to preside in a hearing that would address all the pending motions and the Sheriff's lack of objection, if not consent, to this procedure, we could decline to address this issue as waived.  However, we exercise our discretion to consider the Sheriff's jurisdictional objection because it is an important issue that bears on our resolution of the remaining issues.  *See Pleak v. Entrada Prop. Owners' Ass'n*, 205 Ariz. 471, 475, ¶ 11, 73 P.3d 602, 606 (App.2003) (recognizing exception for important issue bearing on disposition of an appeal).

¶ 17 Addressing what the Sheriff refers to as his "jurisdiction" argument, we first observe that this label is imprecise given that the superior court has original or concurrent subject-matter jurisdiction over all criminal cases arising in Arizona.  Ariz. Const. art. 6, § 14(4); A.R.S. § 12–123(A) (2003).  As our supreme court noted in *Taliaferro v. Taliaferro*, 186 Ariz. 221, 223, 921 P.2d 21, 23 (1996), "the word 'jurisdiction' means different things in different contexts.  In one context, it may mean the authority to do a particular thing.  In another, it may mean the power of the court to entertain an action of a particular subject matter.  These are very different uses."  As the Sheriff candidly acknowledges, a regularly assigned trial judge would have the authority to devise an appropriate remedy for an ongoing deprivation of a defendant's Sixth Amendment right

to counsel in a pending case. Thus, the question before us is whether Judge Baca, as presiding criminal judge, lacked the procedural authority to conduct a joint hearing encompassing all cases in which a defendant had filed a motion to restore the previous visitation schedule.

¶ 18 In civil actions involving a common issue of fact or law, Arizona Rule of Civil Procedure 42(a) permits a court to "order a joint hearing or trial of any or all the matters in issue in the actions." Although the criminal rules do not contain an analogous provision,[7] neither is there a rule specifically forbidding a limited consolidation for the purpose of resolving a common issue of an ancillary nature that is not directly related to the merits of the individual cases.

¶ 19 The defendants argue that the administrative power to make *case* assignments or the other supervisory authority granted presiding judges pursuant to Rule 92 is sufficient to permit a consolidated hearing of similar motions filed in otherwise unrelated criminal cases. While the administrative authority granted presiding judges by Rule 92 may not *alone* be enough to support the broad interpretation urged by defendants,[8] the limited hearing conducted by Judge Baca did not require her to hear any evidence or make any rulings directly impacting the merits of the various cases.[9] Instead, the purpose of the joint hearing was to resolve as expeditiously as possible an urgent ancillary issue impacting the named defendants' constitutional right to communicate with their attorneys in cases pending before the superior court. Because a superior court judge has inherent authority to conduct such proceedings and issue such orders as are necessary

to the complete administration of justice, *Schavey v. Roylston,* 8 Ariz.App. 574, 575, 448 P.2d 418, 419 (1968) ("Courts have inherent power to do all things reasonably necessary for the administration of justice."), we believe Judge Baca, in her capacity as presiding criminal judge, had inherent authority to schedule a consolidated hearing for the limited purpose of receiving evidence and ruling on the privileged visitation issue. *Cf. United States v. Louisville & N.R. Co.,* 221 F.2d 698, 702 (6th Cir.1955) (noting that courts initially established the practice of consolidating actions "as an exercise of their inherent power"). Accordingly, we reject the Sheriff's claim that Judge Baca lacked "jurisdiction" to conduct a joint hearing.

## II. The Scope of the Injunction

¶ 20 The injunction "applied to both those cases in which the superior court heard testimony, listed in footnote one, as well as those cases in which the court did not hear testimony,[2] because the issues and impact are the same in all cases." Footnote one consists of cases involving twelve defendants. Footnote two lists twenty-three defendants' cases for which the court heard no evidence, including that of the lead defendant, Ozie Washington. Although it is possible to conclude from this sentence that the court intended its ruling to apply only to those defendants listed in footnotes one and two, we and both the Sheriff and the defendants interpret the temporary order to apply to all privileged visits to all defendants in the Maricopa County jail facilities. At any given time, there are approximately 10,000 inmates in the jail system.

---

**7.** In criminal appeals, however, cases raising a common question of law or fact may be consolidated by order of the appellate court. Ariz. R.Crim. P. 31.4(b)(1).

**8.** We are aware of instances in which pretrial hearings on the merits of similar issues were held jointly pursuant to agreement by the parties. *See, e.g., State v. Marshall,* 193 Ariz. 547, 549, ¶ 4, 975 P.2d 137, 139 (App.1998) ("Because the DNA issues were identical to those pending in another unrelated prosecution, the parties agreed to consolidate the pretrial admissibility hearing with that of another defendant."). We are unaware of any cases that have approved such a

consolidation over the objection of one of the parties.

**9.** Indeed, Judge Baca was careful to avoid ruling on any case-specific claim. For example, when a defendant representing himself in a capital murder case complained that he had already been "seriously prejudiced" by his inability to confer with his advisory counsel, Judge Baca interrupted and told him "If you have a concern over what happened in the past, then those are motions that are made to the trial judge.... And so I'm going to suggest to you that whatever you need to do, as far as the prior access, that you address that with the trial judge."

¶ 21 Our determination that Judge Baca was authorized to hold a consolidated evidentiary hearing to resolve privileged visitation issues in those cases in which a defendant filed a motion does not necessarily mean, however, that she possessed the authority to enter a broad class injunction generally applicable to *all* in-custody clients. Indeed, at the scheduling hearing, Judge Baca expressed doubt that "in this type of a format [you can] get overall injunctive relief for every Defendant in every facility for all of the different changes in the Sheriff's Office." She added: "My research shows that in order to do that, it really appears to need to be brought as a civil case." The Sheriff agreed with these concerns and subsequently filed a response to the defendants' motion for reconsideration asserting that a civil injunction was not an appropriate remedy.

¶ 22 Notwithstanding the doubts she expressed, when, by the third day of the evidentiary hearing, numerous additional motions regarding privileged visitation had been filed, Judge Baca altered the nature of the proceedings. She informed counsel that she had become "concern[ed] about not being able to hear all motions" and told them: "[W]hat I would like to do is proceed in such a way that the testimony I get is just representative of the issues that are out there based on different cases and that that would suffice for the Court's given understanding of the types of access issues that the defense attorneys are raising at each location...." [10]

¶ 23 Cognizant of the exigent circumstances facing her, we nonetheless believe that Judge Baca should not have expanded the hearing from one to determine whether the constitutional rights of the particular defendants before her were being violated and, if so, tailoring an appropriate rem-

edy for those defendants, to a class-style injunctive action. As Judge Baca accurately noted in her minute entry order, a court has the inherent authority to issue orders necessary for the ordinary and efficient exercise of its jurisdiction. *See Schavey,* 8 Ariz.App. at 575, 448 P.2d at 419. Such authority undoubtedly enables a judge presiding over a criminal trial to enter such orders as are necessary to ensure that the defendant is provided constitutionally adequate access to his attorney. Judge Baca was acting in an adjudicatory capacity in each of the criminal cases in which she heard evidence and issued her temporary orders. As such, she had inherent authority, as would any other superior court judge before whom a consolidated hearing was held, to make findings regarding ancillary matters and issue appropriate orders in those cases. See n. 3, *supra.* But the doctrine of inherent authority is not so broad as to give a judge in a criminal case (or, as here, a judge presiding over a consolidated hearing pertaining to several criminal cases) such extensive authority to regulate jail visitation hours for all inmates in the Maricopa County jail system. *See State ex rel. Andrews v. Superior Court of Maricopa County,* 39 Ariz. 242, 247–48, 5 P.2d 192, 194–95 (1931) (noting that inherent powers exist only to the extent necessary for the ordinary and efficient exercise of jurisdiction already established), *overruled on other grounds by Genda v. Superior Court,* 103 Ariz. 240, 439 P.2d 811 (1968). Moreover, as we discuss below, inherent powers should be exercised with particular caution when their use infringes on the authority of other branches of government. *See State v. C.A.,* 304 N.W.2d 353, 359 (Minn.1981) (noting that "courts must proceed cautiously in exercising [inherent] authority in order to respect the equally unique authority of the executive and

---

**10.** Judge Baca apparently held an off-the-record discussion with counsel immediately preceding the commencement of the third day of the evidentiary hearing at which time she discussed the conduct of future proceedings in the matter. Her statements on the record are a summary of what she refers to as a "long discussion with all counsel present." In their response to the Sheriff's special action petition, defendants contend that the Sheriff's attorney "concurred" with Judge Baca's decision to hear representative testimony. However, the portion of the

record referred to by defendants contains neither a concurrence nor an objection by the Sheriff's attorney with the "representative" procedure instituted by Judge Baca. At a later time during the proceedings, Judge Baca stated "it was at [ ] my direction that we took evidence on representative motions and issues[.]" Whether the Sheriff ever formally objected to the particular manner in which Judge Baca conducted the proceeding is irrelevant given his earlier objection to the authority of Judge Baca to grant broad injunctive relief in criminal cases.

legislative branches of government over their constitutionally authorized functions."). Accordingly, we conclude that Judge Baca lacked the authority to issue a class-style injunction applicable to all similarly situated defendants based on evidence from a limited number of "representative" cases.[11]

¶ 24 Based on our conclusion that Judge Baca's interim order exceeded her authority, we vacate it.[12] To provide proper guidance, we address two additional issues that may arise when this matter returns to the superior court.

### III. Separation of Powers

■ ¶ 25 The Sheriff also contends that Judge Baca's order reinstating the previous visitation schedule is drawn so broadly that it unnecessarily intrudes on the statutory duties assigned the Sheriff, thereby implicating separation of powers concerns that counsel judicial restraint.[13] *See Turner v. Safley*, 482 U.S. 78, 85, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987) ("Prison administration is [ ] a task that has been committed to the responsibility of [the legislative and executive] branches,

and separation of powers concerns counsels a policy of judicial restraint."). The Sheriff maintains that the proper scope of Judge Baca's inquiry is limited to determining whether "specific constitutional violations exist" and, if so, ordering "narrow remedies to correct these violations." To rebut this argument, the defendants primarily contend that the Sheriff limited the visitation schedule due to budgetary concerns and that "financial considerations can never be a justification for depriving in-custody clients' access to counsel or any other basic constitutional right."

■ ¶ 26 The power to "[t]ake charge of and keep the county jail ... and the prisoners in the county jail" belongs to the sheriff. A.R.S. § 11–441(A)(5); *see also* A.R.S. § 31–101 (2002) ("The common jails in the several counties ... shall be kept by the sheriffs of the counties in which they are respectively located."). The broad grant of power to county sheriffs to manage jail facilities necessarily includes the authority to regulate jail visitation schedules. As we observed in *Judd v. Bollman*, 166 Ariz. 417, 418, 803 P.2d

---

11. At oral argument, defendants contended that they would be deprived of any remedy if we determined that Judge Baca lacked authority to issue a broad injunction. We disagree. First, the Sheriff does not contest the inherent authority of a court to grant injunctive relief on an individual basis. Indeed, we commend Judge Baca for acting quickly in granting emergency temporary relief to certain defendants. Second, defendants can seek declaratory/injunctive relief on either an individual or class action basis by filing an appropriate civil lawsuit as was done in all the cases they cite as authority. *See Bell v. Wolfish*, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979); *Hutto v. Finney*, 437 U.S. 678, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978); *Jones v. North Carolina Prisoners' Labor Union, Inc.*, 433 U.S. 119, 97 S.Ct. 2532, 53 L.Ed.2d 629 (1977); *Meachum v. Fano*, 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976); *Pell v. Procunier*, 417 U.S. 817, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974); *Procunier v. Martinez*, 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974); *Smith v. Sullivan*, 553 F.2d 373 (5th Cir.1977); *Youngblood v. Gates*, 200 Cal.App.3d 1302, 246 Cal.Rptr. 775 (1988); *Payne v. Superior Court*, 17 Cal.3d 908, 132 Cal.Rptr. 405, 553 P.2d 565 (1976). *See also Cobb v. Aytch*, 643 F.2d 946 (3rd Cir.1981) (civil-rights class action seeking to enjoin transfer of pretrial detainees and other inmates to distant correctional facilities); *Benjamin v. Malcolm*, 495 F.Supp. 1357 (S.D.N.Y.1980) (civil-rights suit alleging unconstitutional conditions of con-

finement). Finally, judges retain wide discretion in regulating and controlling the business of the court in a manner that does not infringe on the authority of the sheriff. *See, e.g., Brown v. Incarcerated Public Defender Clients Div. 3*, 288 Ga. App. 859, 655 S.E.2d 704 (2007) (upholding trial court order requiring sheriff to transport incarcerated defendants to the courthouse for pre-arraignment interviews with their attorneys).

12. The evidence presented at the hearing may be sufficient to sustain the re-entry of injunctive relief as to certain defendants, subject to our discussion in sections III and IV *infra*.

13. Article 3 of the Arizona Constitution provides:

The powers of the government of the State of Arizona shall be divided into three separate departments, the Legislative, the Executive, and the Judicial; and, except as provided in this Constitution, such departments shall be separate and distinct, and no one of such departments shall exercise the powers properly belonging to either of the others.

The essential purpose of the doctrine of separation of powers is "to allow for independent functioning of each coequal branch of government within its assigned sphere of responsibility, free from risk of control, interference, or intimidation by other branches." *Nixon v. Fitzgerald*, 457 U.S. 731, 760–61, 102 S.Ct. 2690, 73 L.Ed.2d 349 (1982).

138, 140 (App.1991) (holding that justice of the peace's order designating the county jail at which a prisoner would serve his sentence violated the separation of powers doctrine):

[A]bsent any constitutional violations with regard to prisoners, the judiciary has no authority to usurp the functions of the executive branch. Courts have limited authority to interfere with a sheriff's duties to maintain and operate the county jails pursuant to the Arizona Constitution and A.R.S. §§ 11–441(5) and 31–101, and then only to determine whether specific constitutional violations exist and in doing so to order narrow remedies to correct these violations.

¶ 27 Defendants nonetheless contended at oral argument before this court that because a county sheriff functions as a "subordinate arm of the court" when assisting the superior court in its ability to function, the sheriff is therefore subject to the court's control regarding the privileged jail visitation schedule. We disagree. The county sheriff is a constitutional county officer with such powers and duties "as prescribed by law." Ariz. Const. art. 12, §§ 3, 4. The statutory duties of the sheriff are listed in A.R.S. § 11–441. In carrying out certain of the listed duties, the sheriff is acting as an officer of the court. *See, e.g.,* A.R.S. § 11–441(A)(4) (requiring the sheriff to "[a]ttend the court" as requested by the presiding judge and "obey lawful orders and directions issued by the judge"); § 11–441(A)(7) (requiring the sheriff to "[s]erve process and notices in the manner prescribed by law"). It is equally clear, however, that the sheriff does not act as an arm of the court in performing most of the other functions for which the sheriff is assigned responsibility under A.R.S. § 11–441(A), including, as we have already mentioned, acting as a jailor for the county, A.R.S. § 11–441(A)(5). Because a sheriff is not acting as an officer of the court but is acting within the ambit of his power when regulating hours of jail visitation, the superior court generally has no authority to control the exercise of the sheriff's discretion. This distinction was recognized long ago by our supreme court:

It is undoubtedly true that attorneys and sheriffs are officers of the superior court in Arizona. But it is only when the act which the court seeks to control is one committed *as an officer of the court* that it has jurisdiction either to exercise control over the act or to discipline the officer for doing or not doing it.

*State ex rel. Andrews,* 39 Ariz. at 248–49, 5 P.2d at 195.

¶ 28 To be sure, courts have the inherent authority and obligation to provide relief to defendants from jail regulations or decisions by prison administrators that significantly interfere with or unreasonably burden the exercise of their Sixth Amendment right to access to counsel. *See, e.g., Cobb v. Aytch,* 643 F.2d 946, 957 (3rd Cir.1981) (granting injunctive relief in class action enjoining prison transfers that "significantly interfered" with pretrial detainees' access to counsel"); *see also Wolfish v. Levi,* 573 F.2d 118, 133 (2nd Cir.1978) (granting injunctive relief in class action in which prison regulations restricting pretrial detainees' contact with their attorneys were found unconstitutional because they "unreasonably burdened the inmate's opportunity to consult with his attorney and to prepare his defense"), *vacated in part on other grounds by* 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). In vindicating such rights, however, the courts must remember that "doing what is 'reasonably necessary for the proper administration of justice' means doing *no more* than is reasonably necessary." *In re Matter of Alamance County Court Facilities,* 329 N.C. 84, 405 S.E.2d 125, 132 (1991).

¶ 29 The Sheriff does not contend that he cannot be constrained in the performance of his duties when it is necessary to protect a *particular* defendant's constitutional right of access to counsel, but he objects to the all-inclusive nature of Judge Baca's order. We agree with the Sheriff that the proper role of the superior court in this consolidated criminal hearing was limited to determine whether specific Sixth Amendment violations existed in each of the actual cases it considered,[14]

14. To the extent the superior court believed it had authority to revise the visitation hours as not

being "reasonable" under A.R.S. § 13–3901 (2001), we disagree. Absent a constitutional vio-

and, if so, to devise an appropriately tailored remedy for each case. *See United States v. Morrison,* 449 U.S. 361, 367–68, 101 S.Ct. 665, 66 L.Ed.2d 564 (1981) (cautioning that "[c]ases involving Sixth Amendment deprivations are subject to the general rule that remedies should be tailored to the injury suffered from the constitutional violation and should not unnecessarily infringe on competing interests"); *Benjamin v. Fraser,* 264 F.3d 175, 191 (2nd Cir.2001) (upholding a federal district court order denying a motion to terminate consent decrees regarding attorney visitation because, pursuant to the Prison Litigation Reform Act, prospective relief remained necessary to correct ongoing violations of the Sixth Amendment and the relief ordered "extends no further than necessary, and is the narrowly drawn, least intrusive means to correct the violation").

¶ 30 In determining the existence of a constitutional violation, the parties think it significant whether the changes in the privileged visitation policy were instituted for security reasons or as a result of budgetary problems. We do not believe the constitutionality of the changes depends on such a distinction. Although prison officials are accorded some leeway to infringe certain constitutional rights in taking appropriate action to ensure the safety of inmates and corrections personnel, *see Bell,* 441 U.S. at 547, 99 S.Ct. 1861 ("[W]e have held that even when an institutional restriction infringes a specific constitutional guarantee, such as the First Amendment, the practice must be evaluated in the light of the central objective of prison administration, safeguarding institutional security."), the case law does not support a privileged visitation schedule that significantly interferes with or unreasonably burdens the exercise of a defendant's Sixth Amendment rights regardless whether the justification for doing so is based on security concerns or financial considerations. However, as we have already suggested, the court in structuring a remedy should give due deference to the Sheriff's decision to reallocate

personnel to provide adequate jail security within budgetary constraints.

¶ 31 We perceive that Judge Baca's ruling was not structured with these principles in mind. For example, she did not make a finding, nor are we able to conclude based on our review of the record, that the extended visitation schedule she ordered was the most narrowly drawn and the least intrusive means necessary to correct the Sixth Amendment violations she found. If this issue is relitigated in the superior court by individual defendants, the court should proceed in two steps. It should first determine whether a constitutional violation has occurred. If the court finds a constitutional violation, it should then devise a remedy that has no greater impact than necessary on the Sheriff's authority to manage the jails. At this stage, the court should consider providing the Sheriff an opportunity to submit a reasonable proposal for the court's consideration. *Cf. Taylor v. Freeman,* 34 F.3d 266, 269 (4th Cir.1994) ("Even when there is a finding on the merits that unconstitutional conditions exist, federal courts should proceed cautiously and incrementally in ordering remediation so as not to assume the role of prison administrators.").

## IV. The Mediation Order

¶ 32 The Sheriff's final contention is that Judge Baca abused her discretion by requiring him to participate in mediation. As authority for its mediation order, the court cited Arizona Rule of Civil Procedure 16.1, which authorizes the court to schedule a settlement conference on its own motion and require the parties to attend. Although we agree with the court that mediation of the dispute regarding privileged visitation might be a good idea, the Sheriff's role in this case is not the same as that of a party in a civil dispute and he cannot be compelled to participate in mediation.

## CONCLUSION

¶ 33 We reject the Sheriff's argument that the presiding criminal court judge lacked

___

lation, the responsibility for regulating attorney-client visits for jail inmates lies with the sheriff,

not the judiciary.

authority to hold a joint hearing in several cases for the purpose of resolving Sixth Amendment challenges regarding the reduced attorney-client access resulting from the Sheriff's new privileged visitation schedule. But we also conclude that Judge Baca exceeded her authority by granting injunctive, class action-type relief in these criminal cases and not granting each case individualized consideration. Moreover, because the Sheriff is statutorily assigned the responsibility to manage the Maricopa County jail system, any injunctive relief granted by the judiciary to ensure that defendants receive adequate Sixth Amendment access to counsel should be narrowly tailored so as not to unnecessarily infringe on the Sheriff's authority. Finally, Judge Baca could not compel the Sheriff to participate in mediation.

CONCURRING: SUSAN A. EHRLICH, Presiding Judge, and G. MURRAY SNOW, Judge.

